UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| JEREMY TENNYSON,<br>Plaintiff,<br>vs.<br>CAROLYN W. COLVIN, Acting Commissioner of Social Security,<br>Defendant. | No. 4:12-cv-05072-LRS<br>**ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT, *INTER ALIA*** |

**BEFORE THE COURT** are the Plaintiff's Motion For Summary Judgment (ECF No. 21) and the Defendant's Motion For Summary Judgment (ECF No. 22).

**JURISDICTION**

Jeremy Tennyson, Plaintiff, applied for Title XVI Supplemental Security Income benefits (SSI) on April 29, 2008. The application was denied initially and on reconsideration. Plaintiff timely requested a hearing and a video hearing was held on September 13, 2010, before Administrative Law Judge (ALJ) Moira Ausems. Plaintiff, represented by counsel, testified from Kennewick while the ALJ presided in Spokane. Richard Cheney, testified by telephone as a Vocational Expert (VE). On March 4, 2011, the ALJ issued a decision denying benefits. The Appeals Council denied a request for review and the ALJ's decision became the final decision of the Commissioner. This decision is appealable to district court pursuant to 42 U.S.C. §1383(c)(3).

**STATEMENT OF FACTS**

The facts have been presented in the administrative transcript, the ALJ's decision, the Plaintiff's and Defendant's briefs, and will only be summarized here. At the time of the administrative hearing, Plaintiff was 30 years old. He has a high school education and past relevant work experience as a custodian. Plaintiff alleges disability since September 30, 2006.

**STANDARD OF REVIEW**

"The [Commissioner's] determination that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence...." *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983). Substantial evidence is more than a mere scintilla, *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975), but less than a preponderance. *McAllister v. Sullivan*, 888 F.2d 599, 601-602 (9th Cir. 1989); *Desrosiers v. Secretary of Health and Human Services*, 846 F.2d 573, 576 (9th Cir. 1988). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971). "[S]uch inferences and conclusions as the [Commissioner] may reasonably draw from the evidence" will also be upheld. *Beane v. Richardson*, 457 F.2d 758, 759 (9th Cir. 1972); *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). On review, the court considers the record as a whole, not just the evidence supporting the decision of the Commissioner. *Weetman v. Sullivan*, 877 F.2d 20, 22 (9th Cir. 1989); *Thompson v. Schweiker*, 665 F.2d 936, 939 (9th Cir. 1982).

It is the role of the trier of fact, not this court to resolve conflicts in evidence. *Richardson*, 402 U.S. at 400. If evidence supports more than one rational interpretation, the court must uphold the decision of the ALJ. *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).

A decision supported by substantial evidence will still be set aside if the

proper legal standards were not applied in weighing the evidence and making the decision. *Brawner v. Secretary of Health and Human Services*, 839 F.2d 432, 433 (9th Cir. 1987).

## ISSUES

Plaintiff argues the ALJ erred: 1) by improperly rejecting the opinions of his treating and examining providers; 2) by failing to conduct a proper step four analysis and concluding he is capable of performing his past relevant work; and 3) by concluding at step five that he is capable of performing other jobs existing in significant numbers in the national economy.

## DISCUSSION

### SEQUENTIAL EVALUATION PROCESS

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The Act also provides that a claimant shall be determined to be under a disability only if her impairments are of such severity that the claimant is not only unable to do her previous work but cannot, considering her age, education and work experiences, engage in any other substantial gainful work which exists in the national economy. *Id*.

The Commissioner has established a five-step sequential evaluation process for determining whether a person is disabled. 20 C.F.R. § 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S.Ct. 2287 (1987). Step one determines if she is engaged in substantial gainful activities. If she is, benefits are denied. 20 C.F.R. § 416.920(a)(4)(i). If she is not, the decision-maker proceeds to step two, which determines whether the claimant has a medically severe impairment or

combination of impairments. 20 C.F.R. § 416.920(a)(4)(ii). If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step, which compares the claimant's impairment with a number of listed impairments acknowledged by the Commissioner to be so severe as to preclude substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(iii); 20 C.F.R. § 404 Subpart P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one conclusively presumed to be disabling, the evaluation proceeds to the fourth step which determines whether the impairment prevents the claimant from performing work she has performed in the past. If the claimant is able to perform her previous work, she is not disabled. 20 C.F.R. § 416.920(a)(4)(iv). If the claimant cannot perform this work, the fifth and final step in the process determines whether she is able to perform other work in the national economy in view of her age, education and work experience. 20 C.F.R. § 416.920(a)(4)(v).

The initial burden of proof rests upon the claimant to establish a prima facie case of entitlement to disability benefits. *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971). The initial burden is met once a claimant establishes that a physical or mental impairment prevents her from engaging in her previous occupation. The burden then shifts to the Commissioner to show (1) that the claimant can perform other substantial gainful activity and (2) that a "significant number of jobs exist in the national economy" which claimant can perform. *Kail v. Heckler*, 722 F.2d 1496, 1498 (9th Cir. 1984).

## ALJ'S FINDINGS

The ALJ found the following: 1) Plaintiff has “severe” impairments which include major depressive disorder, dysthymia, generalized anxiety disorder, and congenital deformities of the fourth and fifth finger PIP (proximal interphalangeal)

joints bilaterally; 2) Plaintiff does not have an impairment or combination of impairments that meets or equals any of the impairments listed in 20 C.F.R. § 404 Subpart P, App. 1; 3) Plaintiff has the residual functional capacity (RFC) to perform light exertional activity that does not require more than frequent fingering, handling, or feeling, or the performance of more than simple routine tasks that do not involve more than superficial contact with the general public; 4) Plaintiff's RFC allows him to perform his past relevant work as custodian, as he performed it in his particular job setting; and 5) alternatively, the Plaintiff is capable of performing jobs existing in significant numbers in the national economy, as identified by the VE. Accordingly, the ALJ concluded the Plaintiff is not disabled.

**RESIDUAL FUNCTIONAL CAPACITY (RFC)**

It is settled law in the Ninth Circuit that in a disability proceeding, the opinion of a licensed treating or examining physician or psychologist is given special weight because of his/her familiarity with the claimant and his condition. *Benecke v. Barnhart,* 379 F.3d 587, 592 (9th Cir. 2004); *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996); *Smolen v. Chater,* 80 F.3d 1273, 1285-88 (9th Cir. 1996); *Flaten v. Secretary of Health and Human Serv*., 44 F.3d 1453, 1463 (9th Cir. 1995); *Fair v. Bowen*, 885 F.2d 597, 604-05 (9th Cir. 1989). If the treating or examining physician's or psychologist's opinion is not contradicted, it can be rejected only for clear and convincing reasons. *Lester,* 81 F.3d at 830. If contradicted, the ALJ may reject the opinion if specific, legitimate reasons that are supported by substantial evidence are given. *See Flaten*, 44 F.3d at 1463; *Fair*, 885 F.2d at 605. "[W]hen evaluating conflicting medical opinions, an ALJ need not accept the opinion of a doctor if that opinion is brief, conclusory, and inadequately supported by clinical findings."

*Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

Nurse practitioners, physicians' assistants, and therapists (physical and mental health) are not "acceptable medical sources" for the purpose of establishing if a claimant has a medically determinable impairment. 20 C.F.R. §416.913(a). Their opinions are, however, relevant to show the severity of an impairment and how it affects a claimant's ability to work. 20 C.F.R. §416.913(d). An ALJ can reject opinions from these "other source[s]" by providing "germane" reasons for doing so. *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 (9th Cir. 2010).

Lynn Orr, Ph.D., conducted a psychological evaluation of the Plaintiff in November 2006, (Tr. at pp. 377-83), and in conjunction therewith, she completed a Washington State Department of Social & Health Services (DSHS) "Psychological/Psychiatric Evaluation" form in December 2006 (Tr. at pp. 373-76).[1] Plaintiff says "[t]he ALJ **seemed** to reject Dr. Orr's assessment because she found it was not supported by the medical record." (ECF No. 21 at p. 12)(emphasis added). Plaintiff apparently arrived at that conclusion because of the ALJ's statement that Dr. Orr's "conclusions are found to be supported by the record as presently constituted and entitled to evidentiary weight only to the extent consistent with the assessment of mental residual functional capacity in this decision." (Tr. at p. 32). It is unclear why the ALJ made this statement because her conclusion regarding Plaintiff's mental residual functional capacity is consistent with Dr. Orr's assessment. In other words, the ALJ did not reject Dr. Orr's assessment.

In the DSHS form, Dr. Orr checked boxes indicating Plaintiff had a "marked" depressed mood ("[v]ery significant interference with basic work-related

[1] This is the form the State of Washington requires be completed in connection with an individual's receipt of general assistance benefits (GAU or GAX).

activities") and suffered from "severe" social withdrawal ("[i]nability to perform one or more basic work-related activities"). (Tr. at pp. 373-34). However, she also indicated that Plaintiff had, at most, "mild" limitations with regard to cognitive abilities: "Jeremy demonstrates little in the way of impairment of cognitive abilities." (Tr. at p. 375).[2] And, Dr. Orr indicated that Plaintiff had, at most, "moderate" limitations with regard to social abilities ("[s]ignificant interference with basic work-related activities"), in particular, the ability to relate appropriately to co-workers and supervisors, the ability to interact appropriately in public contacts, and the ability to respond appropriately to and tolerate the pressures and expectations of a normal work setting. (Tr. at p. 375).[3] Dr. Orr wrote that: "Jeremy demonstrates marked social anxiety. He would find it difficult to perform in public or in interpersonal contact." (*Id*.). She also wrote that "[a]n antidepressant/antianxiety [medication] could be helpful in relieving his fear and depression" (*Id*.); that "[m]ental health intervention could assist greatly in reducing anxiety/depression and assist him in overcoming social isolation" (Tr. at p. 376); , and that "[h]e could be placed in some type of training if he had

---

[2] The cognitive factors on the DSHS form include: 1) ability to understand, remember and follow simple (one or two step) instructions; 2) ability to understand, remember and follow complex (more than two step) instructions; 3) ability to learn new tasks; 4) ability to exercise judgment and make decisions; and 5) ability to perform routine tasks.

[3] The social factors on the DSHS form include: 1) ability to relate appropriately to co-workers and supervisors; 2) ability to interact appropriately in public contacts; 3) ability to respond appropriately and tolerate the pressures and expectations of a normal work setting; 4) ability to care for self, including personal hygiene and appearance; and 5) ability to control physical or motor movements and maintain appropriate behavior.

counseling started which would offer emotional support."

Not surprisingly, Dr. Orr's November 2006 "Psychological Evaluation" report was consistent with the DSHS form she subsequently completed and the remarks she made therein. Dr. Orr noted the Plaintiff had been prescribed Prozac from 1999 to 2000, "but did not feel it was effective." (Tr. at p. 377). Dr. Orr assigned the Plaintiff a GAF (Global Assessment of Functioning) score of 55. (Tr. at p. 382). A score of 51 to 60 indicates "[m]oderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks" or "[m]oderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, (4th ed. 2000), at p. 34. This GAF score was consistent with the "moderate" limitations in social abilities indicated by Dr. Orr in the DSHS form. Dr. Orr recommended Plaintiff undergo individual or group therapy, as she also did in the DSHS form she completed. (Tr. at p. 376 and p. 382).

In November 2004, prior to Dr. Orr's evaluation, Plaintiff underwent a "Vocational Assessment" at Sunderland Vocational. This assessment was completed by Lorena Swift, "MHC," and Jennifer Haugen, "MSW LICSW." They concluded that "his barriers to employment are significant enough that he will not be able to obtain self-sufficiency within one year . . . ." (Tr. at p. 407). This was not a mental health assessment, however. Rather, "[t]he purpose of this assessment was to gather specific information on employment history, skills, limitations and future rehabilitation needs." (Tr. at p. 405). On the other hand, Robert Armstrong of Sunderland Family Treatment Services did complete several DSHS "Psychological/Psychiatric Evaluation" forms regarding the Plaintiff. On May 20, 2003, Mr. Armstrong indicated Plaintiff suffered from "marked" social withdrawal (Tr. at p. 426) and had "moderate" limitations in his abilities to relate appropriately to co-workers and supervisors, and to respond appropriately to and

tolerate the pressures and expectations of a normal work-setting. (Tr. at p. 427). He wrote that: "Client presents with delayed responses and decreased social skills but is able to maintain employment in a low pressure, low intense environment with mild to moderate supervision." (*Id*.). Mr. Armstrong repeated this assessment in evaluation forms he completed in March and August 2004. (Tr. at pp. 410-17).

Considering Mr. Armstrong's assessment and that Plaintiff's alleged disability onset date was September 30, 2006, the ALJ did not err in failing to address the Sunderland Vocational Assessment in her decision.[4] Dr. Orr's November/December 2006 assessment constituted the first relevant psychological evaluation, and the first of two relevant evaluations conducted by either a licensed psychologist or psychiatrist. And, to the extent it matters, Dr. Orr's assessment was not materially different from the assessment of Mr. Armstrong.

Following the evaluation by Dr. Orr, Plaintiff was evaluated by a number of "other sources," those being mental health therapists and a nurse practitioner. Each of these evaluations was completed in conjunction with Plaintiff's continuing receipt of general assistance benefits from the State and was not akin to the more comprehensive evaluation conducted by Dr. Orr.

In September 2007, Hector Deleo indicated the Plaintiff had a "marked" depressed mood and suffered from "marked" social withdrawal. (Tr. at p. 368). He also indicated the Plaintiff had "moderate" limitations with regard to all of the relevant cognitive abilities and "marked" limitations with regard to all of the relevant social abilities. (Tr. at p. 369). He specifically noted the Plaintiff was

---

[4] In December 2004, not long after the November 2004 vocational assessment, the Plaintiff went to work and engaged in substantial gainful activity as a custodian at a local shopping mall. This job lasted from December 2004 to November 2005. (Tr. at p. 151). It is discussed in more detail, *infra*.

"not on his medications." (*Id*.).

On February 6, 2008, Gordon Cable completed a DSHS form concerning the Plaintiff. He too indicated the Plaintiff suffered from a "marked" depressed mood and "marked" social withdrawal. (Tr. at p. 458). He, however, indicated that as to social abilities, Plaintiff had a "marked" limitation solely with regard to his ability to respond appropriately and tolerate the pressures and expectations of a normal work setting, and a "moderate" limitation with regard to his ability to relate appropriately to co-workers and supervisors. (Tr. at p. 459). And, he indicated Plaintiff suffered from only a "mild" limitation with regard to his ability to interact appropriately in public contacts ("[n]o significant interference with basic work-related activities"). (*Id*.). He wrote that "[m]edication may help with his depressive symptoms and anxiety symptoms, however his ability to work may be limited by his **physical** problems." (*Id*.). (Emphasis added).

Although Plaintiff underwent an intake assessment with Catholic Family & Child Service (CFCS) in March 2008 (Tr. at pp. 469-81), he did not begin mental health counseling and therapy there until June 2008. (Tr. at p. 625). His caseworker was Dell Anderson. In a December 2008 DSHS form completed by Mr. Anderson, he indicated Plaintiff suffered from "severe" depressed mood and "marked" social withdrawal and expression of anger (verbal and/or physical). (Tr. at p. 529). He indicated Plaintiff had "marked" cognitive limitations with regard to his ability to understand, remember and follow complex (more than two step) instructions and his ability to learn new tasks. (Tr. at p. 530). He indicated Plaintiff had a "marked" limitation with regard to his abilities to respond appropriately and tolerate the pressure and expectations of a normal work setting and to care for self, including personal hygiene and appearance, but that the limitation was "moderate" with regard to his abilities to relate appropriately to co-workers and supervisors, interact appropriately in public contacts, and control physical or motor movements and maintain appropriate behavior. (*Id*.). Mr.

Anderson specifically noted that "[t]he client is not currently prescribed medications, although he may benefit from them." (*Id*.).

In a March 2009 DSHS form, nurse practitioner (ARNP) John Evans indicated Plaintiff suffered from a "moderate" depressed mood, verbal expression of anxiety or fear, and thought disorder. He indicated "none" regarding severity of "social withdrawal." (Tr. at p. 504). However, he also indicated Plaintiff had "marked" limitations in his abilities to relate appropriately to co-workers and supervisors and to interact appropriately in public contacts, and a "severe" limitation in his ability to respond appropriately and tolerate the pressures and expectations of a normal work setting. (Tr. at p. 505). He recommended vocational counseling and medication management. (*Id*.).

Dell Anderson completed another DSHS form for the Plaintiff in January 2010. This time he indicated Plaintiff suffered from "severe" depressed mood and "severe" social withdrawal, but only "moderate" verbal expression of anxiety or fear. (Tr. at p. 542). He indicated that Plaintiff continued to have a "marked" limitation in his ability to understand, remember and follow complex instructions, but that the limitation was "moderate" with regard to all other cognitive factors. (Tr. at p. 543). He continued to indicate Plaintiff had a "marked" limitation with regard to his ability to respond appropriately and tolerate the pressure and expectations of a normal work setting, while the limitation was now "moderate" with regard to his ability to care for self, including personal hygiene and appearance, continued to be "moderate" with regard to his abilities to relate appropriately to co-workers and supervisors and interact appropriately in public contacts, and was now "mild" with regard to his ability to control physical or motor movements and maintain appropriate behavior. (*Id*.). He once again pointed out the Plaintiff was not on prescribed medications, noting that Plaintiff did not want to try medications because "they make him feel lousy and he doesn't like them." (Tr. at pp. 543-44).

In November 2010, Plaintiff underwent an "Initial Psychiatric Evaluation" by Rinah Gutierrez, M.D., at CFCS. His assessment was as follows:

> [T]his is a 30 y/o M who presents with chronic depressive symptoms with lack of motivation to do anything. These are perpetuated by dissatisfaction about current living situation with brother, issues with his pet dog and isolation. Although he may benefit from antidepressant medications, he is hesitant to start any meds at this time. He will need to work on pursuing his plans of independent living, which can improve his self-esteem.

(Tr. at p. 556). He assigned the Plaintiff a GAF score of 50.[5] A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g, no friends, unable to keep a job)." (*Id.*). He did not, however, identify any particular restrictions regarding Plaintiff's ability to perform work-related activities. Dr. Gutierrez recommended "antidepressant medications like Citalopram but patient could not give consent at this time." (*Id.*). He recommended the Plaintiff call him when he decided to give such consent. (*Id.*). There is no indication, however, that Plaintiff ever gave such consent.

In the end, there is not an apparent material difference between the opinions of the two "acceptable medical sources," Dr. Orr and Dr. Gutierrez. And, as is evident, the opinions of the "other sources" regarding the severity of Plaintiff's mental health limitations are all over the board and of varying levels of consistency and inconsistency with the opinion of Dr. Orr. To the extent the ALJ

---

[5] This was higher than the GAF score of 46 which Yosen Liu, M.Ed., assigned the Plaintiff during his intake assessment. (Tr. at p. 479). As the ALJ noted, however, Ms. Liu also diagnosed the Plaintiff with a bipolar disorder (*Id.*), a diagnosis not found by either of the two "acceptable medical sources," Dr. Orr and Dr. Gutierrez. Only "acceptable medical sources" can offer an opinion whether a particular impairment exists.

rejected those opinions which were inconsistent with the opinion of Dr. Orr, the ALJ provided "germane" reasons for doing so. The ALJ also aptly noted that Plaintiff continually refused to comply with recommendations that he take antidepressant medication, and that he did not seek out mental health therapy for a year and half after Dr. Orr had so recommended. (Tr. at p. 40). These were relevant considerations regarding the severity of Plaintiff's mental limitations because the record establishes that Plaintiff is not cognitively impaired to an extent rendering him mentally incapable of seeking out therapy and consenting to take medication. *Chaudry v. Astrue*, 688 F.3d 661, 672 (9th Cir. 2012).

The ALJ's mental RFC determination- that Plaintiff is limited to the performance of simple routine tasks that do not involve more than superficial contact with the general public- is supported by substantial evidence in the record (more than a scintilla, less than a preponderance).

**PAST RELEVANT WORK**

At step four, the Commissioner may deny benefits when the claimant can perform the claimant's past relevant work as "actually performed," or as "generally" performed. *Pinto v. Massanari*, 249 F.3d 840, 845 (9th Cir. 2001). Although the claimant has the burden of proving an inability to perform his past relevant work, "the ALJ still has a duty to make the requisite factual findings to support [her] conclusion." *Id*. at 844. To determine whether a claimant has the residual functional capacity to perform his past relevant work, the ALJ must ascertain the demands of the claimant's former work and then compare the demands with his present capacity. *Villa v. Heckler*, 797 F.2d 794, 797-98 (9th Cir. 1986). In finding that an individual has the capacity to perform a past relevant job, the determination or decision must contain the following specific findings of fact: (1) a finding of fact as to the individual's residual functional capacity; (2) a finding of fact as to the physical and mental demands of the past job/occupation;

and (3) a finding of fact that the individual's residual functional capacity would permit a return to his past job or occupation. Social Security Ruling ("SSR") 82-62.

As discussed above, the ALJ did make a finding of fact as to Plaintiff's RFC which is supported by substantial evidence in the record. The ALJ also found the following regarding Plaintiff's past work as a custodian:

> Based upon the claimant's description of his particular job as a custodian in agency questionnaires and testimony and in view of the fact that he was able to perform such work despite his congenital joint deformities of the fourth and fifth fingers, it is determined that he has not been precluded from engaging in such past relevant work, as he actually performed it in his particular work setting, for any continuous 12-month period relevant to this adjudication.

(Tr. at p. 41). The "agency questionnaires" (see "Work History Report," Tr. at pp. 151-52) and administrative hearing "testimony" referred to by the ALJ set forth the physical and mental demands of Plaintiff's past work as a custodian. At the hearing, Plaintiff testified his job involved watering the plants and that his supervisors kept him "off the floor" for the most part so that he would not be doing cleaning activities around customers. (Tr. at pp. 64-65). According to Plaintiff, "I think they were, kind of, unsure about me being able to deal with customers 'cause I'm, kind of, quiet and unless I really know what I'm talking about, I'm not very fast to answer." (Tr. at p. 65). Plaintiff says he thought he did "okay" when he was put on "the floor." (*Id*.). He testified he quit after the management changed and the new manager, on one particular workday, demanded he work an additional two hours for which he had not been scheduled. (Tr. at pp. 66-67). In her decision (Tr. at p. 41), the ALJ noted that in the "Disability Report" he completed, the Plaintiff indicated he stopped working not for reasons related to his condition, but "due to [a] personality conflict with management." (Tr. at p. 142). In the same report, Plaintiff indicated he developed a way to handle job tasks, notwithstanding limitations related to holding objects in his hands. (*Id*.).

In sum, there is nothing in the record indicating the physical and mental demands of Plaintiff's past relevant work, as he performed it, were incompatible with his RFC as determined by the ALJ: light exertional activity[6] that does not require more than frequent fingering, handling, or feeling, or the performance of more than simple routine tasks that do not involve more than superficial contact with the general public. Plaintiff did not meet his burden of proving an inability to perform his past relevant work and the ALJ made the requisite factual findings in this regard.

**OTHER WORK**

At the administrative hearing, the ALJ asked the VE to identify other work in the national economy which the Plaintiff could perform "consistent with the manipulative limitations and mental limitations posed." (Tr. at p. 85). One of the jobs the VE identified was "escort vehicle driver," an unskilled occupation involving a sedentary level of exertion. (Tr. at pp. 85-86). Therefore, even if Plaintiff's RFC did not allow him to perform his past relevant work as a custodian, it did allow him to perform other jobs existing in the national economy.[7]

## CONCLUSION

---

[6] "Light" work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. It requires a good deal of walking or standing, or involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. §416.967(b). The "Work History Report" completed by Plaintiff indicates the heaviest and most frequent weight he lifted in his custodian position was 10 pounds. (Tr. at p. 152).

[7] Plaintiff testified he has a driver's license (Tr. at p. 78) and there is no indication in the record that he has any problem with driving.

Defendant's Motion For Summary Judgment (ECF No. 22) is **GRANTED** and Plaintiff's Motion For Summary Judgment (ECF No. 21) is **DENIED**. The Commissioner's decision denying benefits is **AFFIRMED**.

**IT IS SO ORDERED.** The District Executive shall enter judgment accordingly and forward copies of the judgment and this order to counsel of record.

**DATED** this 24th of February, 2014.

***s/Lonny R. Suko***

LONNY R. SUKO
Senior United States District Judge